# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Civil No. 07-4435 (DSD/JSM)

DON HODGE

       Plaintiff,

v.                                                    **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE
Commissioner of Social Security,

       Defendant.

_____

JANIE S. MAYERON, United States Magistrate Judge

     The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 10] and Defendant's Motion for Summary Judgment [Docket No. 14]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

     Defendant has denied Plaintiff Don Hodge's application for disability insurance benefits (DIB) and social security income (SSI) under the Social Security Act, 42 U.S.C. §§423, 1381. The action is now before the court on cross-motions for summary judgment. Plaintiff is represented by Benjamin J. Reitan. Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney.

     For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment [Docket No. 10] be GRANTED and Defendant's Motion for Summary Judgment [Docket No. 14] be DENIED.

## I.     PROCEDURAL BACKGROUND

     On March 3, 2004, Don Hodge ("Hodge") filed his application for disability insurance benefits ("DIB") and Social Security Income ("SSI"), alleging an onset date of July 1, 2002 (Tr. 89-

91, 99-103), due to cardiomyopathy, conjunctive heart failure, status post injuries to the left shoulder and left leg with chronic pain involving arms, hands, legs, feet, gout, sleep apnea, anxiety, depression and memory loss.  (Tr. 21, 457).  He was last insured for disability insurance benefits through December 31, 2007. (Tr. 22).

The application was denied initially and upon reconsideration. (Tr. 21, 44-46, 59-61). On April 27, 2005, Hodge requested a hearing before an Administrative Law Judge. (Tr. 21, 39). A hearing was held before Administrative Law Judge ("ALJ") Michael Quayle on August 8, 2006, in Mankato, Minnesota. (Tr. 21). On December 1, 2006, the ALJ issued a decision finding Hodge not disabled because he can perform a significant number of jobs in the national economy. (Tr. 21-28). On December 21, 2006, Hodge filed a Request for Review of Hearing Decision. (Tr. 13-17). On August 30, 2007, the Appeals Council denied Hodge's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 6-9). See, 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 404.981.

## II.   PROCESS FOR REVIEW

"The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." 42 U.S.C. §1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). Disability means that the claimant is unable to work by reason of "medically determinable" physical or mental impairment or impairments. 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. § 404.1509.

A.   **Administrative Law Judge Hearing's Five-Step Analysis**

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929., 416.1429, 422.201 et seq. To determine the existence and extent of a claimant's disability, the ALJ must follow a five step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education, and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process, as follows:

> The first step asks if the claimant is currently engaged in substantial gainful employment. If so, the claimant is not disabled. If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities. If not, the claimant is not disabled. If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled. The fourth step asks if the claimant's impairments prevent her from doing past relevant work. If the claimant can perform past relevant work, she is not disabled. The fifth step involves the question of whether the claimant's impairments prevent her from doing other work. If so, the claimant is disabled.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

B.   **Appeals Council Review**

If a claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-404.982, 416.1467-416.1482. The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon a claimant unless the matter is appealed to Federal District Court within 60 days of notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

C.   **Judicial Review**

4

Judicial review of the ALJ's decision generally proceeds by considering the decision of the ALJ at each of the five steps. The Court is required to review the administrative record as a whole and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of plaintiff's impairments.

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir.1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir.1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir.2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir.1996); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir.1992). "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir.2000).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir.1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner,

213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir.2000)); see also Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir.1998).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir.1993). "It is not my job to decide the facts anew, reweigh the evidence, or substitute my judgment for that of the Commissioner. In this regard, I 'must consider both evidence that supports and evidence that detracts from the Secretary's decision, but may not reverse merely because substantial evidence exists for the opposite decision .'" Callison v. Callahan, 985 F.Supp. 1182, 1186 (D.Neb.1997) (citations omitted).

The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. INS v. Elias-Zacarias, 502 U.S. 478, 481 n. 1 (1992); Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir.1994). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir.1987).

A claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir.1991). Once a claimant has demonstrated that he or she cannot perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir.1985).

III.   **DECISION UNDER REVIEW**

A.   **The ALJ's Findings of Fact**

The ALJ concluded that Hodge was not entitled to disability insurance benefits under 216(i)

and 223 of the Social Security Act.  The ALJ based this decision on the following findings:

1. The claimant met the disability insured status requirements on July 1, 2002, the date the claimant stated he became unable to work, and he continues to meet them through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since July 1, 2002.

3. The claimant is severely impaired by cardiomyopathy/congestive heart failure, an organic mental disorder, and an affective disorder.

4. The medical evidence establishes that the claimant does not have an impairment, or combination of impairments, that meets or is medically equal to an impairment found in the Listing of Impairments at 20 C.F.R., Subpart P, Appendix 1.

5. The claimant's testimony regarding the severity of his symptoms and functional limitations was not fully credible due to significant inconsistencies in the record as a whole.

6. The claimant retains the residual functional capacity to perform a light level of work involving occasionally lifting up to 20 pounds, frequently lifting up to 10 pounds, sitting and standing for six hours each in an eight hour workday with the ability to alternate positions, unlimited pushing and pulling, and work involving routine three to four step uncomplicated instructions, brief and superficial contact with the public, co-workers, and supervisors, and low stress routine three to four step work.

7. The claimant is unable to perform his past relevant work as a shipping clerk because the demands of the job exceed his residual functional capacity.

8. The claimant is 50 years of age, which is defined as an individual closely approaching advanced age, and he has a high school level education.

9. Considering the claimant's residual functional capacity, age, education, and relevant work history, he is able to make a vocational adjustment to work which exists in significant numbers in the national economy, examples of which are assembly positions, a parking lot attendant, and a security monitor.

10. The claimant has not been under a disability, as defined in the Social Security Act, at any time on or before the date of this decision.

(Tr. 27).

**B.**     **The Administrative Law Judge's Application of the Five- Step Process**

The ALJ followed the five step sequential evaluation process for determining whether an individual is disabled under 20 C.F.R. § 404.1520(a) and 416.920(a).

At step one, the ALJ found that Hodge has not engaged in substantial gainful activity at any time since July 1, 2002, the alleged onset date of disability. 20 C.F.R. § 404.1520(b). (Tr. 22).

At the second step, the ALJ found that Hodge has the following severe impairments: cardiomyopathy/congestive heart failure, an organic mental disorder and an affective disorder. 20 C.F.R. § 404.1520(c) and 416.920(c). (Tr. 22). The ALJ did not find that Hodge's alleged impairments relating to his left shoulder, left leg, gout and sleep apnea were severe because they were controlled with medication and there was no evidence of functional limitations lasting at least twelve months in duration. Id.

At the third step in the evaluation process, the ALJ found Hodge did not have an impairment that meets or equals an impairment listed in Appendix 1. (Tr. 22). In making this finding, the ALJ first analyzed the severity of Hodge's mental impairments within four areas of functioning. (Tr.23). The ALJ found that Hodge has "mild restriction of activities of daily living, mild to moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, no episodes of decompensation, of decompensation, of extended duration, and no evidence of the C criteria of the Listings." Id.

In support of his finding that Hodge had mild restriction of activities of daily living, the ALJ stated that Hodge maintained a stable residence, and was able to stay alone during the day. Id. Hodge is able to take care of his personal needs, prepare meals and do laundry. Id. While Hodge claimed that he needed reminders and performed activities slowly, the ALJ found this was generally due to his physical conditions, and that there was no evidence that Hodges was not able to engage in a wide range of activities on a "sustained, useful and routine basis." Id.

Hodge indicated that he had decreasing social interaction, yet the ALJ found that Hodge maintained stable relationships and friendships. (Tr. 23). Hodge had no history of altercations, evictions, firings, social isolation or fear of interpersonal relationships. Id. Based upon this information, the ALJ found that he had moderate limitations in social functioning. Id.

Hodge reported significant difficulties with memory and completion of tasks. (Tr. 23). The ALJ indicated that cognitive testing revealed a low average intellectual functioning and some memory deficits. Id. However, Hodge was noted consistently to be oriented to person, place, and time. Id. He also had the ability to maintain sufficient focus to complete his cognitive testing, capable of handling his finances and taking his medications. Id. He was responsible for waking his children, getting them ready in the morning and driving them to school. Id. On this basis, the ALJ found Hodge to have moderate limitations in concentration, persistence and pace.

The ALJ found that the record did not support any episodes of decompensation of extended duration. Id. The ALJ also found that there was no need for psychotropic medications, psychological counseling or psychiatric hospitalization. Id.

Step four requires that the ALJ first determine Hodge's residual functional capacity ("RFC") and then consider whether he can still do work he has done in the past. 20 C.F.R. § 404.1520(e). Determination of the RFC requires consideration of the evidence taken as a whole, including not only objective medical evidence, but also the subjective complaints expressed by the claimant. Polaski v. Heckler, 739 F.2d 1320, 1321-1322 (8th Cir.1984). In evaluating those subjective complaints, the ALJ must consider the objective medical evidence or its absence, along with prior work record and observations by third parties and treating and examining physicians. Id. at 1322.

The ALJ found that Hodge has the residual functional capacity to perform "a light level of work involving occasionally lifting up to 20 pounds, frequently lifting up to 10 pounds, sitting and standing for six hours each in an eight hour workday with the ability to alternate positions, unlimited

pushing and pulling, and work involving routine three to four step uncomplicated instructions, brief and superficial contact with the public, co-workers and supervisors, and low stress routine three to four step work." (Tr. 24).

In making this determination, the ALJ found that the objective medical evidence was not consistent with the severity of his allegations. (Tr. 24).  For example, Hodge claimed a disability beginning July 2002, yet the medical records did not document any medical treatment until May 2003 when he was hospitalized for shortness of breath and symptoms of congestive heart failure.  Id. In addition, Hodge had reported to his treating doctors that he was in good health prior to that date. Id. The ALJ also found that although Hodge had been hospitalized on three different occasions in 2003 for symptoms of cardiomyopathy and congestive heart failure, by February 2004, the medical evidence showed that there was an improvement in Hodge's condition with the use of medications, and stabilization of his condition. Id.

With respect to Hodge's use of and adverse affects from medications, the ALJ indicated that Hodge had testified that the medications caused him nausea and fatigue (Tr. 24).  However, Hodge had neither reported adverse side effects to treating doctors nor requested that his medications be changed. Id.  From this evidence, the ALJ concluded that Hodge was satisfied with his present medications and that he had the ability to reduce the severity of him symptoms through the use of medication. Id.

As for Hodge's mental health, the ALJ rejected the significant difficulties Hodge's claimed he was having with memory and mood, based on the fact that Hodge has not sought or received any mental health treatment, did not use psychotropic medication and had not needed psychiatric hospitalization or crises center interventions. (Tr. 24).

The ALJ also considered Hodge's activities of daily living in evaluating his allegations that he could not perform any gainful activity. (Tr. 25). The ALJ observed that in his Disability Appeal

Report and at trial, Hodge stated that he completed very few activities throughout the day with the exception of preparing coffee for himself, walking and driving his children to school. (Tr. 25). The ALJ contrasted these statements with the statements he made during a psychological evaluation in 2004, where he indicated that he did chores on a hobby farm that had pigs, chickens and other animals, and the statements Hodge made in 2005 to his physician that he was working in the field during hot and humid weather, and he was carrying a bucket of corn weighing at least 50 pounds. Id. Based on the numerous inconsistencies in the record regarding Hodge's activities of daily living, the ALJ concluded that Hodge's claims regarding the severity of his symptoms and functional limitations were not credible. Id.

The ALJ also analyzed Hodge's work history, and noted that it included sporadic employment with long periods of unemployment, and that he had not sought or received any vocational or rehabilitation training to assist him with employment. Id. From this, the ALJ found that Hodge had not exhibited a significant effort towards returning to work. Id.

In summary, the ALJ found that neither the objective medical evidence, nor Hodge's use of medications, lack of psychological treatment, daily activities and work history supported his allegations of incapacitating limitations. (Tr. 25).

In reaching Hodge's residual functional capacity, the ALJ stated that he considered all medical opinions. (Tr. 25-26). However, the ALJ did not place controlling weight on the opinion of Hodge's treating physician, Dr. Keeley, that Hodge could stand and walk for less than two hours in An eight-hour workday and sit for less than two hours in an eight-hour workday, and would be expected to miss work more than three times a month.  (TR. 25).  "Dr. Kelly [sic] has provided no basis for this opinion which is inconsistent with the weight of the evidence of record which documents improvement in cardiac function."  (Tr. 25-26, 443-45).  In addition, the ALJ noted that by November 2005, Hodge had reported that he felt well, was not experiencing shortness of breath,

orthopnea,[1] paroxmysmal nocturnal dyspnea,[2] and he had occasional fast heart rate, but denied syncope,[3] lightheadedness, peripheral edema,[4] lower extremity pain, and muscle weakness, and he had no neurological or sensory deficits.  (Tr. 26, 408-410).  Consequently, the ALJ refused to give Dr. Keeley's opinion controlling weight because it was "not well supported by clinical findings, laboratory diagnostic techniques, and is not consistent with other substantial evidence of record. . ." (Tr. 26). The ALJ did place significant weight on the opinion of the state agency consultants. (Tr. 25).

At step four, based on the testimony of the vocational expert, the ALJ determined that Hodge was unable to do his past relevant medium semi-skilled work as a shipping clerk. (Tr. 26). Id. Thus, the ALJ proceeded to the fifth step.

---

[1]     Orthopnea is defined as "discomfort in breathing that is brought on or aggravated by lying flat.  STEDMANS 287270, Stedmans Medical Dictionary (27th ed. 2000).

[2]     Paraxmysmal nocturnal dyspnea is defined as "acute dyspnea (difficulty in breathing, often caused by heart failure or lung disease) appearing suddenly at night, usually waking the patient from sleep; caused by pulmonary congestion with or without pulmonary edema that results from left-sided heart failure following mobilization of fluid from dependent areas after lying down."  Stedmans 122310, STEDMANS Medical Dictionary (27th ed. 2000).

[3]     Syncope is defined as "loss of consciousness and postural tone caused by diminished cerebral blood flow."  STEDMANS 369790, Stedmans Medical Dictionary (27th ed. 2000).

[4]     Edema is defined as "an accumulation of an excessive amount of watery fluid in cells or intercellular tissues."  STEDMANS 124770, Stedmans Medical Dictionary (27th ed. 2000).

The final step of the evaluation is to determine whether a claimant can do other work given his residual functional capacity assessment and considering his age, education and past work experience. 20 C.F.R. § 404.1520(f). The vocational expert testified that an individual with Hodge's impairments, residual functional capacity, age, high school education and past relevant work experience could perform a number of jobs. (Tr. 26). These jobs included light unskilled assembly positions with 20,000 jobs available in the Minnesota economy, light unskilled parking lot attendant positions with 1,000 jobs available in the Minnesota regional economy, and sedentary unskilled security monitor with 3,000 jobs available in the Minnesota regional economy. Id. Therefore, the ALJ found that Hodge could perform a significant number of jobs in the national economy. Id.

Based upon his analysis of the five-step process for determining if a claimant is disabled, the ALJ found that the Social Security Administration had met its burden in this case to prove that a significant number of jobs exist in the national economy which Hodge could perform. Accordingly, the ALJ concluded that Hodge did not meet the statutory criteria for a finding of disability.

## IV.   THE RECORD

### A.   <u>Background</u>

Hodge was 50 years old on the date of the ALJ hearing. (Tr. 21). He has a high school education and past relevant work as a shipping clerk. Id.

**B.**  **Medical Records**

On May 25, 2003, Hodge was admitted to Immanuel St. Joseph's Hospital in Mankato, Minnesota for increasing shortness of breath and complaints of symptoms of congestive heart failure. Id.(Tr. 149). A cardiac catheterization was administered to Hodge that showed no coronary artery disease (Tr. 149, 161-62). Hodge's condition improved as medications were added throughout the hospitalization. Id. Hodge reported that he was doing well upon discharge. At the time of discharge he was place on the following medications: Aspirin, Digoxin, Lasix, Captopril, Lipitor and Toprol XL. Id.

Upon admittance to the hospital, Hodge stated that he had worked as a forklift operator and other machinery operator, but had lost his job. (Tr. 155). He was working on his small family farm when he started developing shortness of breath and it did not go away completely. Id. Hodge indicated he had pigs, chickens and goats, and that he was grinding corn for pigs when be became short of breath. (Tr. 155, 159)

On September 17, 2003, Hodge entered Immanuel St. Joseph's Hospital with abdominal pain and shortness of breath with orthopnea. (Tr. 193). He was discharged on September 26, 2003, at which time the principal diagnosis was cardiomyopathy, and secondary diagnoses of congestive heart failure and sleep apnea. Id. Hodge was started on Protonix for his abdominal pain. Id.

On September 30, 2003. Hodge was seen at the Minnesota Ear, Head and Neck Clinic. He stated that approximately three months ago he could "lift logs and was as strong as a bull." (Tr. 264). At this time, he was complaining of shortness of breath, severe headache and feeling sickly. Id. The conclusion was that he had obstructive sleep apnea and it was recommended that he attend a sleep study. (Tr. 265).

On October 5, 2003, Hodge entered Abbott Northwestern Hospital for evaluation of his abdomen and leg swelling. (Tr. 266). Dr. Michael Ornes stated that one week prior to that admission,

Hodge had been admitted to Mankato Hospital for dyspnea. Id. In May, 2003, Hodge had an "episode where some 'silo' material fell on him.  Before that he denied having any medical problems." Id. Dr. Ornes also noted that the angiogram done at Mankato Hospital had negative results. (Tr. 267). Hodge was treated with ACE inhibitor and beta-blocker and was diuresed[5] heavily. Id.  Dr. Ornes indicated that Hodge might be a candidate for a cardiac transplant, which would be determined by Dr. Olivari. Id. Hodge was discharged on October 15, 2003. Id.

On November 5, 2003, Hodge met with Dr. Wilfred Corson at a sleep center upon referral by Dr. Teresa Olivari. (Tr. 299-300). Dr. Corson noted that Hodge had gained sixty pounds in a short period of time and experienced shortness of breath, which he blamed on corn dust. (Tr. 299). Dr. Corson also noted that Hodge had been receiving treatment for his congestive heart failure and that he had stated that he felt much better. Id. Dr. Corson indicated that Hodge had lost almost all of the weight he had gained, and that Hodge had started on a CPAP machine[6] for his sleep apnea and felt much better. Id. He stated that he woke up rested, was not tired anymore, and had much more energy. Id.

Hodge had a follow-up visit with Dr. Corson on November 11 and 12, 2003, for a split night sleep study. (Tr. 297). He was diagnosed with severe obstructive sleep apnea. Id. He was set up with a nasal CPAP. Id. On January 28, 2004, Hodge went back to Dr. Corson for a follow-up visit. (Tr. 294). Hodge reported that he was on the auto-set machine and was able to wear it about three hours a night. Id. Dr. Corson was going to try to exchange masks for him to allow him to keep the mask on for a longer period of time. Id.

---

[5]     Diuresis is defined as "excretion of urine; commonly denotes production of unusually large volumes of urine." STEDMANS 117510, Stedmans Medical Dictionary (27th ed. 2000).

[6]     CPAP is the "abbreviation for continuous positive airway pressure", STEDMANS 9336, Stedmans Medical Dictionary (27th ed. 2000).

On February 17, 2004, Dr. Olivari wrote to Dr. Keeley stating that she had seen Hodge that day for a follow-up appointment from his September 2003 hospitalization. (Tr. 309). Dr. Olivari stated she had first seen Hodge in connection with his hospitalization at Abbott Northwestern Hospital for congestive heart failure. Id. At that time, he was in class IV congestive failure with biventricular failure and his ejection fraction was measured at 13%. Id. Dr. Olivari stated that at this time Hodge complained of nausea and that his heart slowed down after taking his medication. Id. Dr. Olivari indicated that when Hodge had previously had these complaints, he had been taken off of Digoxin and his symptoms had improved, but now they had returned in the last two to three weeks. Id. Hodge denied any shortness of breath, orthopena, paroxmysmal nocturnal dyspnea, periphereal edema, chest pain, syncope and presnycope. Id. He had been recently diagnosed with sleep apnea. Id. Dr. Oliveri noted that a repeat echocardiogram showed remarkable improvement in Hodge's left ventricular function, -- his ejection fraction, which was 13% in September of 2003, was now calculated at 45% -- and the left ventricular had decreased in size. Id.

On March 23, 2004, Hodge was seen by Dr. Keeley for numbness and tingling in his right fingers. (Tr. 391-92). He also complained of chest congestion but denied any chest pain or orthopnea. (Tr. 391). Dr. Keeley noted that Hodge's heart rate was normal, and had a regular rhythm without murmer. Id. Hodge had a lesion on his nose that was not healing properly. Id. Dr. Keeley referred him to specialists and had a long discussion with Hodge regarding diet and exercise. (Tr. 391-92). Dr. Christopher Meyer, an orthopedic specialist, saw Hodge on April 8, 2004 for the numbness and tingling in his right hand. His diagnosis was that Hodge had ulnar neuropathy and recommended Hodge be scheduled for an EMG procedure. (Tr. 389-90).

On April 22, 2004, Dr. Keeley saw Hodge for pain in his right foot. (Tr. 391). Dr. Keeley noted that Hodge had a history of congestive heart failure, flutter and sleep apnea. Id. Objective findings reported by Dr. Keeley indicated that Hodge's heart rate was normal and had a regular

rhythm. (Tr. 388). Dr. Keeley found some erythema[7] and tenderness on Hodge's right foot consistent with gout. <u>Id.</u> With respect to his assessment and prognosis, Dr. Keeley indicated that Hodge had gout and prescribed Indocin for it. <u>Id.</u> Dr. Keeley also stated "Congestive heart failure – it appears to be improving. His last echo was up to 45%. I congratulated him on this." <u>Id.</u>

Dr. Aaron Mark, a state agency physician reviewed Hodge's medical records on June 17, 2004. (Tr. 374-382). He determined that Hodge could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand or walk for about 6 hours in an 8 hour workday; had unlimited restrictions regarding push and/or pull; and no postural, manipulative, visual, communicative or environmental limitations. (Tr. 375, 377- 79). Dr. Mark noted that up until May 2003, Hodge was fine except for multiple injuries to his left shoulder and knee from an auto accident in 1987, and an arthoscopy to his right knee in 2001. (Tr. 376). In May of 2003, Hodge was diagnosed with severe dilated cardiomyopathy, which was treated with medication. <u>Id.</u> In September 2003, Hodge had congestive heart failure; he was transferred to Abbott Northwestern in October 2003, at which time it was determined his coronary arteries were normal and they treated his dilated cardiomyopathy. <u>Id.</u> A note from February 2004 indicated that his echocardiogram that had previously shown ejection fractions of 15 to 20% was now up to 45% and he was no longer short of breath. <u>Id.</u> Thus, Dr. Mark concluded that "from a cardiac point of view he's markedly better." <u>Id.</u> Dr. Mark also indicated that Hodge had complained of some numbness in the 4th and 5th fingers of his right hand, and that if it was determined that he had ulnar neuropathy and he had surgery, he would have good long term results. <u>Id.</u> Dr. Mark opined that Hodge could do a light RFC and gave him no hand restrictions. <u>Id.</u>

---

[7]     Erythema is defined as redness due to capillary dilation, STEDMANS 137230, Stedman's Medical Dictionary, (27th ed. 2000).

On June 28, 2004, Dr. Olivari wrote to Dr. Keeley stating that she had seen Hodge that day. (Tr. 303). Dr. Olivari indicated that Hodge reported that he had not had any chest pain, orthopena or paroxmysmal nocturnal dyspnea. Id. Hodge did state that he experienced some shortness of breath when working in the field in hot and humid weather, but that his exercise tolerance was markedly improved and he was able to put a fence around his field without any problem. Id. Dr. Olivari also noted that Hodge had recently installed a fence without any health concerns. Id. Hodge had previously reported heart palpitations and that his heart was slowing down, for which he had been taken off of Digitalis. Id. Now he reported no heart palpitations or that his heart was slowing down. Id. Hodge did have one episode of dizziness in the previous month when carrying in hot weather a load of corn weighing at least 50 pounds, but had no recurrence. Id. Hodge stated he had gained approximately 10 pounds in the winter, which he had recently lost with increased physical activity. Id. Hodge also reported that he had two instances of gout, which were resolved with medication. Id. Hodge's heart examination was normal without murmur, rub or gallop. (Tr. 304). Dr. Olivari stated that Hodge did not have any evidence on physical exam for pulmonary or peripheral congestion and "he was asked to continue on the same cardiac medications." Id. Hodge was started on Allopurinol and Dr. Olivari recommended follow-up exam with a repeat echocardiogram. (Tr. 304).

On November 1, 2004, Dr. Olivari saw Hodge for a regular follow-up visit. (Tr. 425). She noted that the last time she had seen him, in June, 2004, he was doing well with the exception that he was not using his CPAP machine on a regular basis and was not following the low cholesterol, low fat, low calorie, low sodium diet prescribed to him. Id. Hodge denied dizziness, syncope, presynocope, or palpitations. Id. He indicated he had been under a lot of stress recently because he had almost lost his farm, but the problem has been resolved. Id. Hodge stated that he had been using his CPAP machine, but Dr. Olivari could not verify if that was true (in the past he had said he was using the machine, but his wife said he was not). Id. The EKG showed that Hodge was

tachycardiac.[8] (Tr. 428).  The echo results for his left ventricular function declined from 40% in February to a current result of 30%, but his left ventricular function was better than it was at presentation. Id. Hodge did not show any evidence of pulmonary or periphereal congestion. Id. Hodge denied any anxiety, depression, mental disturbance or suicidal ideation. (Tr. 426). Because of his tachycardia, worsening echo and change in medications, Dr. Olivari indicated she wanted to see Hodge in two months. (Tr. 428).

On November 3, 2004, Hodge saw Dr. Linda Marshall, a psychologist, for a consultative examination. (Tr. 319-24). Hodge reported memory and concentration difficulties over the past two to three years, and stated that he was easily frustrated. (Tr. 319-320). He was not able to remember pertinent facts throughout the interview such as where he completed his computer programming education or the medications he was taking. Id. When asked about his typical day, Hodge stated that he got up early to take his kids to school at 7:45 a.m. and then did chores on his farm, which has pigs, chickens and other animals. (Tr. 320). He mentioned that once he started a chore, he was able to complete it, but he did not start something if it was a difficult project. (Tr. 320-321). He stated that he was able to do laundry and some cooking. (Tr. 321).  Hodge drove and worked with his wife to pay bills. Id. Dr. Marshall reported that Hodge's social skills were adequate, although Hodge reported that while he has friends, he does not socialize with them. Id.

Dr. Marshall conducted a mental status examination of Hodge.  As a result of this examination, she opined the following: He had many of the vegetative symptoms of depression, including lack of motivation, interest in things, and a pervasive feeling of hopelessness; he spoke at average pace and volume and was easily understood; his thought content was normal; he was fully oriented to person, place, situation and time; he was able to slowly do three, four and five digits

---

[8]     Tachycardiac is defined as "relating to or suffering from excessively rapid action of the heart", STEDMANS 398870, Stedmans Medical Dictionary, (27th ed. 2000).

forward at a halting pace, but could only do two and three digits backward; while he said he had

short term memory problems, he was able to recall three unrelated words over a five-minute period;

and his intellectual functioning appeared to be in the low average range. (Tr. 321-22). Dr. Marshall

did not consider Hodge to be a reliable informant due to his memory problems, and she believed his

judgment was impaired and he had limited insight. (Tr. 322-23). While Hodge appeared to have

some maladaptive personality traits, he did not have a personality disorder. (Tr. 323). Dr. Marshall

diagnosed Hodge with a mood disorder due to general medical condition (heart problems), with

depressive features and a cognitive disorder. Id. She assigned him a GAF of 50,[9] and recommended

further testing to validate the extent of his memory problems and concentration and attention

difficulties. Id.

On January 26, 2005, Hodge saw Dr. Marshall for testing of his memory problems. (Tr. 327-

28). Dr. Marshall stated that he was in the average range of intellectual functioning (Tr. 327) and

had some memory deficits. (Tr. 328).

Hodge saw Dr. Oliveri for a follow-up appointment on February 3, 2005. Hodge indicated

that he felt much better, which he attributed in part to being under less stress. (Tr. 421). She noted

that Hodge's blood pressure was under control and that he denied any dizziness, orthopnea, chest

pain, claudication[10], paroxmysmal nocturnal dyspnea, synocope, palpitations, chest pains,

lightheadedness, depression, anxiety, mental disturbance or suicidal ideation. (Tr. 421, 422, 424).

Based on her physical examination, Dr. Olivari reported that Hodge did not have any evidence for

---

[9]      The GAF scale is used to assess an individual's overall level of functioning. Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000 Revision)).  The GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed. 2000 Revision).

pulmonary or peripheral congestion, and his blood pressure was under control with medications. (Tr. 424). However, Dr. Oliveri stated that Hodge was still not following the low cholesterol, low fat, low sodium diet prescribed to him. Id.

On February 16, 2005, state agency psychologist, Dr. Joseph M. Alsdruf, performed a Mental Residual Functional Capacity Assessment. (Tr. 348-66). Based on his review of Dr. Marshall's consulting evaluation and testing, Alsdurf concluded that Hodge had the capacity to concentrate on, understand and remember routine repetitive tasks, but would have moderate problems with detailed tasks; and marked problems with complex instructions; his ability to carry out tasks with adequate persistence and pace would be intact for routine, repetitive tasks, or three and four step tasks, but would be moderately impaired for detailed tasks and markedly impaired for complex tasks; his ability to interact with co-workers would be moderately impaired, but adequate for brief and superficial contact; his ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact; his ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision in most customary work settings; and his ability to handle stress would be moderately impaired, yet adequate to tolerate the stressors of a routine, repetitive and three and four step work setting.  (Tr. 350).

On May 10, 2005, Hodge again saw Dr. Oliveri and stated that he had seen an increase in his fatigue and his shortness of breath in the last week, which he associated with moderate exercise and humidity. (Tr. 415). Occasionally, he experienced numbness in his hands and has had an irregular pulse. Id. Hodge stated he was still working full-time as a farmer. Id. Hodge denied any dizziness, synocope, presyncope, palpitations, nausea, chest pain, claudication, lightheadedness, orthopnea, paroxmysmal nocturnal dyspnea, peripheral edema, depression, anxiety, mental disturbance or

---

[10]     Claudication is defined as "limping, usually referring to intermittent claudication", STEDMANS 81880, Stedmans Medical Dictionary (27th ed. 2000).

suicidal ideation. (Tr. 415-16). Dr. Oliveri observed that his right ventricle was normal, the left ventricle was not dilated and the  echocardiogram showed improvement from 30% to 35%. (Tr. 417). Dr. Olivari did not find any evidence of arrhythmia in her examination of Hodge, but gave Hodge a Holter monitor to document whether he has any arrhythmia when he experiences any palpitations or irregular pulse. (Tr. 418). Hodge stated he was not using the CPAP on a regular basis because he has difficulty tolerating the mask. (Tr. 415). Dr. Olivari suspected that he might not be using it at all. Id.

On November 15, 2005, Dr. Keeley saw Hodge and reported that Hodge's blood pressure was excellent, he was in no acute distress and his heart rate was normal, with regular rhythm and without murmur. (Tr. 385). Dr. Keeley noted that Hodge did have difficulty in the past with gout in his right foot (Tr. 385).

On November 21, 2005 Dr. Olivari wrote to Dr. Keeley after seeing him that day for a follow-up. (Tr. 408). Dr. Olivari summarized Hodge's medical history as follows:

> As you recall, he is a 49-year-old gentleman who presented a few years ago with severe dilated cardiomyopathy and markedly decreased ejection fraction at only 15%. The patient has normal coronary arteries and it was thought that his dilated cardiomyopathy was most likely secondary to untreated hypertension as well as drug abuse. With medical treatment, the patient has improved and in fact, his ejection fraction has normalized 18 months ago. However, last year patient discontinued for a short period of time his medications and his ejection fraction dropped again to 30%.

(Tr. 408).

Dr. Olivari stated on that at this visit Hodge claimed "that he feels quite well." (Tr. 408). He denied having any shortness of breath, orthopnea, paroxysmal nocturnal dyspnea, and peripheral edema, and while he is aware of an occasional fast heart rate, he denied any syncope, presyncope or lightheadedness. Id. Hodge admitted that his weight was increasing over the past few months. Id. He was recently started on predisone for an episode of gout which was under control, but denied having any pain related to the gout. Id. He claimed he was using his CPAP for his sleep apnea daily. Id.

Based on her physical examination of Hodge, Dr. Olivari stated that Hodge appeared "to be doing clinical well," and that he had no evidence for pulmonary or peripheral congestion. (Tr. 410). She noted that the echocardiogram showed improvement since May in his left ventricular function and was measuring at approximately 50% ejection rate, and she stated that his left ventricle size was normal. Id. Dr. Olivari also stated that "[t]he improvement in echocardiogram with patient taking more faithfully his medications has been related to the patient." Id. She indicated that Hodge was to continue on the same medication, except niacin, and that he should be seen in a year for a repeat echocardiogram. Id. She also recommended that he had to lose weight, and should exercise on a daily basis by walking at least a half hour daily. Id.

On May 8, 2006, Hodge saw Dr. Keeley for ankle pain in his left foot. (Tr. 451). He indicated that he was seeking Social Security disability benefits due to his congestive heart failure for which he had been seen by Dr. Olivari. Id. Dr. Keeley noted that Hodge has had a history of gout. Id. Hodge reported no chest pain, shortness of breath, orthopnea or paroxmysmal nocturnal dyspnea. Id. Hodge's heart had a normal rate and regular rhythm. Id. Dr. Keeley diagnosed Hodge with left ankle swelling consistent with acute gout. Id. He prescribed Prednisone. Id. Dr. Hodge noted that he filled out the form for Social Security disability regarding Hodge's congestive heart failure. Id.

**C.      Hearing Before the Administrative Law Judge**

Hodge testified at the hearing. (Tr. 479-485). He stated that he could not work due to heart problems that caused fatigue. (Tr. 479). Hodge stated that his cardiomyopathy caused shortness of breath and reduced his endurance. (Tr. 480). For example, he was unable to climb up the five steps into his house without taking a break. Id.

Hodge also stated that he was currently having problems with his left leg and left shoulder from his previous injuries. (Tr. 481-82). The leg swelled up more often and then he has to elevate it,

and the shoulder was always sore. (Tr. 482). If his shoulder was hit or brushed against, Hodge experienced excruciating pain. (Tr. 482-483).

Hodge's typical day consisted of waking at 6 a.m., making coffee and going to the bathroom. (Tr. 484). At that point in his day, he was already exhausted and needed to lay down for 30 minutes on most days. Id. During the day, he watched the children and occasionally did chores. (Tr. 480). He could not do any typical farming duties because of his fatigue, except feed the dogs. (Tr. 481). He claimed if he tried to fix the fencepost, he would run out of breath and have to return home. Id. He said that it took him two to three days to complete a project, like fixing a doorknob, that would have taken him an hour to fix in the past. (Tr. 485).

Hodge elaborated on his memory problems, stating that he could not remember the names of friends. (Tr. 483). He also testified that the gout in his right foot caused "crippling consequences". (Tr. 483-84).

As to medications, Hodge stated that he was on a number of them and that the side effects are nausea and the need to sit down. (Tr. 484).

Hodge's wife, Sally Hodge, testified that she had been married to Hodge for ten years. (Tr. 486). She noted that his typical day consisted of waking up, making coffee and not doing much else the remainder of the day. (Tr. 486-87). Hodge slept downstairs in the living room because he "doesn't do the stairs very well. (Tr. 486). If Hodge had a project he wanted to do, she and the children had to help him or he would return to the house. (Tr. 487). Usually he had to lie down and elevate his legs. Id. If his legs were not elevated, they would swell and he could not walk. (Tr. 488). When Hodge took his medications, he had to lie down as he suffered from nausea for about an hour after taking the medicine. Id. Before all of this occurred, Hodge worked 10-hour days on the farm. (Tr. 489). Now their son mowed the lawn and the only chores Hodge did was feed the dogs in the morning. Id.

Steve Bosch appeared as the vocational expert ("VE") at the hearing. He submitted a Vocational Analysis prior to the hearing. (Tr. 148). The only past relevant work he reported for Hodge was shipping clerk. (Tr. 148). Given Hodge's residual functional capacity as found by the ALJ, the VE testified that Hodge could not return to his past work. (Tr. 492). He further testified that he could perform other work such as assembly positions, parking lot attendant and security monitor. (Tr. 492).

## V.    DISCUSSION

Hodge contends the ALJ erred in his evaluation in five respects. First, he maintained that the ALJ failed to give proper weight to the opinions of Dr. Keeley, Hodge's treating physician, and instead gave significant weight to the opinions of the state agency medical consultants.   See Plaintiff's Mem., pp. 7-11. Second, Hodge asserted that the ALJ improperly discounted his subjective complaints without documenting the inconsistencies in the evidence. Id., pp. 12-15. Third, Hodge argued that the ALJ should have found him limited to at most sedentary work, and therefore, found him disabled as of his 50th birthday based on Social Security Regulation 201.14. Id., pp. 15-17. Fourth, Hodge claimed that the ALJ failed to complete and attach a required Psychiatric Review Technique Form. Id., pp. 17-18. Fifth, Hodge submitted that since he was found to be disabled on re-application, that decision must be reviewed for the time period covered in this appeal. Id., pp. 18.

Defendant argued summary judgment should be entered in his favor on grounds that the ALJ properly relied on the medical source opinions, properly evaluated Hodge's subjective complaints and was not required to follow Social Security Regulation 201.14. Defendant also contended that a Psychiatric Review Technique Form was not required, and the finding of disability upon re-application by Hodge did not affect this appeal.

### A.    Medical Opinions

Hodge has been treating with internist Dr. Daniel Keeley, who has seen Hodge on numerous

occasions and referred Hodge to other specialists for consultation and treatment. On July 24, 2006, Dr. Keeley completed a medical assessment form regarding Hodge's physical ability to perform work-related activities. (Tr. 443-45). He opined that Hodge could lift 50 pounds on an occasional basis and 20 pounds on a frequent basis. (Tr. 443). Further, he determined that Hodge could only stand and walk less than two hours during an eight-hour day, could only sit for less than two hours. Id. Dr. Keeley also indicated that Hodge could sit for only 60 minutes before changing positions, stand for only 15 minutes, and that he must walk around after only 20 minutes, and he must walk for 20 – 30 minutes each time he got up. Id. In addition, Hodge needed the opportunity to shift at will from sitting and standing/walking, and he needed to be able to lie down at unpredictable intervals. Tr. 444). Dr. Keeley indicated that Hodge could occasionally (i.e. from very little up to one-third of an eight hour day) twist, stoop, crouch, climb stairs and climb ladders. (Tr. 444). With respect to the functions of reaching, handling, fingering, feeling and pushing/pulling, Dr. Keeley opined that Hodge's impairments did not affect these functions.  (Tr. 445). As to environmental restrictions, however, Dr. Keeley placed no restrictions on Hodge's exposure to noise, but indicated that Hodge should avoid even moderate exposure to extreme cold, and should avoid all exposure from extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. Id.  Finally, Dr. Keeley stated that Hodge's impairments would cause him to be absent from work more than three times a month. Id.

The only medical finding Dr. Keeley identified to support his assessment was Hodge's congestive heart failure. (Tr. 444).  The ALJ stated that he did not place controlling weight on Dr. Keeley's assessment of Hodge's ability to function in the workplace because the record did not support his finding.  (Tr. 25-26).

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). Further, a claimant's RFC is a medical question. See Lauer v. Apfel, 245 F.3d 700,

704 (8th Cir.2001) (citation omitted). The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001). In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations. Id.

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir.2000). Nonetheless, the RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.'" Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir.2003) (quoting Nevland v. Apfel, 223 F.3d 853, 858 (8th Cir.2000)).

Medical opinions are evaluated under the framework described in 20 C.F.R. § 404.1527. In according weight to medical opinions, the ALJ should consider the following factors: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist. 20 C.F.R. § 404.1527(d).

A treating physician's opinion is typically entitled to controlling weight if it is well supported by "medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in the record." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir.2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir.2000); 20 C.F.R. § 404.1527(d)(2)). Absent these two requirements, the ALJ need not accord controlling weight to a treating physician's opinion and the ALJ may not give a treating physician's opinion controlling weight based solely on the fact that he or she is a treating physician.  Prosch, 201 F.3d at 1013.

On the other hand, even if the opinions of treating physicians are not entitled to controlling weight, the regulatory framework still contemplates that they may be given significant weight. In this regard, SSR96-2p states:

> Adjudicators must remember that a finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

Thus, the ALJ may credit other medical evaluations over a treating physician when such other opinions are supported by better or more thorough evidence. Prosch, 201 F.3d at 1013; see Hancock v. Secretary of the Dep't of HEW, 603 F.2d 739, 740 (8th Cir. 1979). "The conclusions of any medical expert may be rejected 'if inconsistent with the medical record as a whole.'" Davis v. Apfel, 239 F.3d 962, 967 (8th Cir.2001). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch, 201 F.3d at 1013.

Here, while it is true that Dr. Keeley had treated plaintiff for some period of time, his specialty was internal medicine and not cardiology. More to point, however, the record as a whole supports the ALJ's decision to credit other medical evaluations over Dr. Keeley's functional assessment and to instead rely upon the opinion of the state agency medical consultant, Dr. Aaron Mark, who based his functional analysis in June 2004, on his review of the records, including those of Hodge's treating cardiologist, Dr. Olivari, (Tr. 376), and on the November 2005 report by Dr. Olivari, herself. (Tr. 408-409).

First, the records before the ALJ indicated that from the time Hodge was first diagnosed with heart problems in May 2003 up to the date of the hearing on August 8, 2006, Dr. Keeley saw Hodge on four different times. (Tr. 385, 388, 391-92, 451). On none of these occasions did Dr. Keeley see or treat Hodge for issues related to his congestive heart failure. Id. More critically, to the extent that Dr. Keeley addressed Hodge's issues with his heart, he noted normal findings. (Tr. 385, 388, 391, 451). In fact, in April 2004, Dr. Keeley noted that Hodge's echo was up to 45%, and he "congratulated him on this." (Tr. 388). The last time Dr. Keeley saw Hodge, in May 2006, Dr. Keeley indicated that Hodge had reported no chest pain, shortness of breath, orthopnea or paroxmysmal nocturnal dyspnea. (Tr. 451). Further, Hodge's heart had a normal rate and regular rhythm. Id. Dr. Keeley diagnosed Hodge with left ankle swelling consistent with acute gout, and prescribed him Predisone for it. Id. There is nothing in Dr. Keeley's medical records that would lend support for or is consistent with his opinions on Hodge's functionality.

Second, at the same time that Dr. Keeley was seeing Hodge, Dr. Olivari, Hodge's treating cardiologist, saw him on six different occasions for his congestive heart failure. (Tr. 303-304, 309, 408, 410, 415-418, 425-428). Her reports showed that Hodge had exhibited steady improvement, and that his heart condition was well controlled with medication. In her last report, dated November 21, 2005, Dr. Olivari noted that Hodge had stated that he was feeling quite well. (Tr. 408). He denied having any shortness of breath, orthopnea, paroxysmal nocturnal dyspnea, and peripheral edema, and while he is aware of an occasional fast heart rate, he denied any syncope, presyncope or lightheadedness. Id. He indicated he had recently started on predisone for an episode of gout which was under control, but denied having any pain related to the gout. Id. Based on her physical examination of Hodge, Dr. Olivari stated that Hodge appeared "to be doing clinical well," and that he had no evidence for pulmonary or peripheral congestion. (Tr. 410). She also noted that the

echocardiogram showed improvement since May 2005 in his left ventricular function and was measuring at approximately 50% ejection rate, and she stated that his left ventricle size was normal. Id. Dr. Olivari attributed Hodge's improvement to the fact that he was "taking more faithfully his medications." Id. She also recommended that he had to lose weight, and should exercise on a daily basis by walking at least a half hour daily. Id.

There is nothing in any of Dr. Olivari's reports, including her recommendation that he engage in regular exercise, that are consistent with the level of functional impairments given by Dr. Keeley.

For all of these reasons, this Court concludes that the ALJ properly determined that Dr. Keeley's functional capacity assessment should not be given controlling weight.

### B.   Subjective Complaints

Failure to give some consideration to a claimant's subjective complaints is reversible error. Brand v. Secretary of the Dept. of Health, Educ. and Welfare, 623 F.2d 523, 525 (8th Cir. 1980). "[A] headache, back ache, or sprain may constitute a disabling impairment even though it may not be corroborated by an x-ray or some other objective finding." Id. An ALJ must consider a claimant's subjective complaints, regardless of whether they are corroborated by objective medical findings. Id.; see also Cline v. Sullivan, 939 F.2d 560, 566 (8th Cir. 1991).  On the other hand, "we will not substitute our opinions for that of the ALJ, who is in a better position to assess a claimant's credibility."  Id. (citing Woolf, 3 F.3d at 1213).

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)). The Polaski factors require the ALJ to give full consideration to all the evidence presented relating to a

claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

1.      the claimant's daily activities;

2.      the duration, frequency, and intensity of the pain;

3.      precipitating and aggravating factors;

4.      dosage, effectiveness, and side effects of medication;  and

5.      functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same); Baumgarten v. Chater, 75 F.3d 366, 368 (8th Cir. 1996) (same); Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (same); Cline, 939 F.2d at 565 (same); Callison, 985 F. Supp. 1182, 1186 (D. Neb. 1997) (same). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."  Cox, 160 F.3d at 1207.

"An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson, 87 F.3d at 1017 (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)). "The ALJ may discount a claimant's allegations of pain when he explicitly finds them inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 207. The ALJ may not disregard a claimant's subjective complaints solely because he or she believes the objective medical evidence does not support them.  Griffon v. Bowen, 856 F.2d 1150, 1154 (8th Cir. 1988).

If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony." Cline 939 F.2d at 565. "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the

evidence presented and discuss the factors set forth in Polaski when making credibility determinations." Id. On the other hand, the ALJ is not required to methodically discuss each Polaski consideration, so long as he acknowledged and examined those considerations. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)

In this case, Hodge argued that the ALJ erred by failing to afford credibility to his subjective complaints of pain. Hodge asserted that the ALJ inadequately explained the basis for evaluating Hodge's credibility, and only mentioned the inconsistencies in the record as a whole. In particular, Hodge submitted that the ALJ improperly focused on Hodge's statements about being a farmer and doing farm work, placed too much reliance on his ability to do farm chores, and misrepresented Hodge's satisfaction with the effects of his medication. See Pl.'s Mem., pp. 13-15.

This Court finds that the ALJ properly set forth the inconsistencies in the evidence and discussed the factors set forth in Polaski with regards to plaintiff's subjective complaints of pain. Specifically, the ALJ found that plaintiff's complaints were inconsistent with the objective medical evidence, his medications, treatment, daily activities, and work history. (Tr. 24-25). Further, as set forth below the ALJ's credibility determination is supported by substantial evidence in the record.

1.      Objective Medical Evidence

As discussed above, under the care of Hodge's own cardiologist, Dr. Olivari, Hodge showed improvement through his last visit with her in November, 2005. For example, by October 2003, his coronary arteries were normal and his dilated cardiomyopathy had been treated. (Tr. 376).   In February 2004, Hodge denied to Dr. Olivari any shortness of breath, orthopena, paroxmysmal nocturnal dyspnea, periphereal edema, chest pain, syncope and presnycope. (Tr. 309). Dr. Oliveri noted that a repeat echocardiogram showed remarkable improvement in Hodge's left ventricular function, in that previously the echocardiogram had shown ejection fractions of 15 to 20% and now it was up to 45%, and he was no longer short of breath. Id.

Similarly, in June 2004, Hodge denied chest pain, orthopena, paroxmysmal nocturnal dyspnea, heart palpitations or that his heart was slowing down. (Tr. 303). Hodge's heart examination was normal without murmur, rub or gallop. (Tr. 304). Dr. Olivari stated that Hodge did not have any evidence on physical exam for pulmonary or peripheral congestion. Id.  Hodge also reported that he had two instances of gout, but they were resolved with medication.  (Tr. 303).

On November 1, 2004, Hodge saw Dr. Olivari again for a follow-up visit, at which time he denied dizziness, syncope, presynocope, or palpitations. (Tr. 425). However, at this time the EKG showed that Hodge was tachycardiac, and the echo results for his left ventricular function had declined from 40% in February to a current result of 30%, but his left ventricular function was better than it was at presentation. (Tr. 428). Dr. Olivari did not find any evidence of pulmonary or periphereal congestion. Id.

Hodge saw Dr. Oliveri for a follow-up appointment on February 3, 2005, at which time he indicated that he felt much better. (Tr. 421). Hodge denied any dizziness, orthopnea, chest pain,

claudication[11], paroxmysmal nocturnal dyspnea, synocope, palpitations, chest pains, lightheadedness, depression, anxiety, mental disturbance or suicidal ideation. (Tr. 421, 422, 424). Based on her physical examination, Dr. Olivari reported that Hodge did not have any evidence for pulmonary or peripheral congestion, and his blood pressure was under control with medications. (Tr. 424).

In May 2005, Hodge saw Dr. Olivari and again denied any dizziness, synocope, presyncope, palpitations, nausea, chest pain, claudication, lightheadedness, orthopnea, paroxmysmal nocturnal dyspnea, peripheral edema, depression, anxiety, mental disturbance or suicidal ideation. (Tr. 415-16). The physical examination showed that the right ventricle was normal, the left ventricle was not dilated and the echocardiogram showed improvement from 30% to 35%. (Tr. 417). Dr. Olivari did not find any evidence of arrhythmia in her examination of Hodge. (Tr. 418).

At Dr. Olivari's final consultation with Hodge in November, 2005, Hodge had reported "that he feels quite well." (Tr. 408). He denied having any shortness of breath, orthopnea, paroxysmal nocturnal dyspnea, and peripheral edema, and while he was aware of an occasional fast heart rate, he denied any syncope, presyncope or lightheadedness. Id. The physical examination of Hodge showed no evidence for pulmonary or peripheral congestion. (Tr. 410). In addition, the echocardiogram showed improvement since May in his left ventricular function and was measuring at approximately 50% ejection rate, and Hodge's left ventricle size was normal, which Dr. Olivari attributed to Hodge "taking more faithfully his medications has been related to the patient." Id. Dr. Olivari stated that Hodge appeared "to be doing clinical well," at the time of this visit. (Tr. 410).

There is nothing in the medical evidence that contradicts the RFC developed by the ALJ for Hodge.

---

[11]     Claudication is defined as "limping, usually referring to intermittent claudication",

STEDMANS 81880, Stedmans Medical Dictionary (27th ed. 2000).

2.     Treatment and Medication

Hodge argued that the ALJ improperly found that he had not complained of any adverse effects from his medication, and from this, incorrectly concluded that he was satisfied with the effects of his present medications. The Court finds that the ALJ properly analyzed Hodge's use of medications. Hodge testified that he experienced nausea and fatigue following the ingestion of medications. The ALJ properly discounted this testimony because the records did not support this claim. The records show that the only time that Hodge complained of side-effects from his medications was in September 2003, when he complained to Dr. Olivari of nausea and that his heart slowing down after taking his medications. (Tr. 309). As a consequence, Hodge was taken off of Digoxin and his symptoms improved. Id. Thereafter, there is no mention in any other medical records of nausea, fatigue or any adverse side effects from his medication. (Tr. 385, 416, 422, 426, 451). Further, in June 2004, Dr. Olivari stated "he was asked to continue on the same cardiac medications," (Tr. 309), and in November 2005, Dr. Olivari attributed Hodge's improved echocardiogram to his "taking more faithfully his medications", which she indicated he would continue. (Tr. 310). In short, the medical records are completely at odds with Hodge's testimony that he experienced nausea and fatigue immediately upon ingestion.

3.     Activities of Daily Living

One of the main inconsistencies Hodge presented at the hearing was regarding his daily activity level. At the hearing, he testified that while he may have indicated to his physicians that he was a farmer, he did so only to avoid saying that he was a disabled person, and that he did not farm. (Tr. 479). Hodge and his wife further testified that he did very little except make coffee, feed the dogs, and take the children to school. (Tr. 480-81, 486-87). The ALJ found this testimony to be inconsistent with the level of activities actually performed by Hodge, as reflected in the record.

(Tr. 25).This Court agrees. The record shows that on June 28, 2004, Dr. Olivari commented on Hodge working too hard in the hot and humid weather, but noted that his exercise tolerance was markedly improved and that Hodge was able to install a fence around his field without problem. (Tr. 303). She also reported that he had been carrying a load of corn weighing at least 50 pounds the previous month. Id.

In November 2004, he reported to the consulting psychologist, Dr. Marshall, that his typical day included taking his children to school at 7:45 a.m. and then doing chores on his farm, which had pigs, chickens and other animals. (Tr. 320). He also stated that he did laundry and some cooking, and that he drove and works with his wife to pay bills. (Tr. 320-321).

In November 2005, Dr. Oliveri recommended that Hodge exercise on a daily basis by walking at least a half hour daily. (Tr. 409).

These records suggest that Hodge was not fully credible when he testified that he engaged in virtually no activities.

4.      Work History

The ALJ found that Hodge had not exhibited a significant effort towards returning to work based on the analysis of Hodge's work history, which the ALJ noted included sporadic employment with long periods of unemployment, and that he had not sought or received any vocational or rehabilitation training to assist him with employment. (Tr. 25). Hodge did not challenge this finding.

In summary, having examined the record pursuant to the Polaski factors, this Court concludes that the ALJ properly evaluated Hodge's subjective complaints, sufficiently explained the basis for discounting them, and that the record as a whole supports the credibility determination of Hodge by the ALJ.

### C.      Social Security Regulation  201.14

Hodge argued that since he was 50 years old at the time of the ALJ hearing, he should be found disabled pursuant to SSR 201.14. See 20 C.F.R., Part 404, Subpart P, Appendix 2. Specifically, Hodge maintained that if the ALJ had properly found that he was limited to at most sedentary work, given his age at the time of the hearing (50 years old), his education (high school) and past relevant employment at a medium exertional level, then he would "grid out," meaning that unless his skills from his previous work were transferable, he would be deemed disabled. See Pl.'s Mem., p. 15. In response, defendant argued that the ALJ properly relied on the opinion of Dr. Aaron Mark, who reviewed the record on June 17, 2004, and properly arrived at a light work level RFC. See Def.'s Mem, p. 20.

SSR 201.14.states that in order be found disabled at the age of 50, a claimant must be found to be limited to a sedentary RFC with a high school education, skilled or semi-skilled previous work experience and non-transferable skills. Id. at Table 1.

In this case, the ALJ did not find that Hodge was limited to a sedentary RFC, but instead found that Hodge had an RFC of light work. (Tr. 27). In reaching this finding, the ALJ relied in part on the opinion of Dr. Aaron Mark, who reviewed the record on June 17, 2004, and determined that Hodge could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit and stand for 6 hours in an 8-hour workday with the ability to alternate positions, and that he required no pushing and pulling limitations, or postural, manipulative, visual, communication or environmental limitations. (Tr. 374-79). In support of this assessment, Dr. Mark stated that Hodge had undergone an arthroscopic procedure in 2001 on his right knee and was fine until May 2003, when he became short of breath and it was determined that he had dilated cardiomyopathy, which was severe, but was treated. (Tr. 376).

Dr. Mark further noted that Hodge had congestive heart failure in September 2003, was transferred to Abbott Northwestern Hospital in October 2003, where he was found to normal coronary arteries, and his cardiac impairment had been treated. Id. In February 2004, Hodge's echocardiogram was up to 45% from where it had been at 15-20%, and thus, Dr. Mark found that from a cardiac standpoint, Hodge was markedly better. Id. Dr. Mark also indicated that Hodge had complained of some numbness in the 4th and 5th fingers of his right hand, and that if it was determined that he had ulnar neuropathy and he had surgery, he would have good long term results. Id. Thus, based on Dr. Mark's review of the medical evidence, he concluded that Hodge had a light RFC. Id.

Hodge bases his claim of a sedentary level of work or less on Dr. Keeley's medical opinion. However, as previously stated in this Report and Recommendation, the ALJ properly placed less weight on the opinion of Dr. Keeley. Having concluded that there is substantial evidence in the record as a whole to support the RFC determined by the ALJ, the Court finds that SSR 201.14 does not apply in this situation.

**D.      Psychiatric Review Technique Form**

Hodge submitted that this case should be remanded because the ALJ did not fill out and attach a Psychiatric Review Technique Form (PRTF) to his decision. Pl.'s Mem., p. 22. However, as argued by defendant, an ALJ is no longer required to complete the PRTF form. See Jumping Eagle v. Barnhart, 2006 WL 858972, Soc. Sec. Rep. Serv. 572 (March 27, 2006); see also Collier v. Comm'r of Soc. Sec., 2004 WL 1922187, at *4 (6th Cir. Aug. 24, 2004) (stating that as of August 2000 the ALJ is no longer required to attach a copy of the PRTF). Pursuant to 20 C.F.R. §§ 404.1520(a) and 416.920(a), all that the ALJ is required to do is include a complete analysis of the criteria and functions associated with a mental impairment.  The ALJ did that analysis in this case.

(Tr. 23). Accordingly, the Court rejects Hodge's suggestion that the case must be remanded to the ALJ on this basis.

### E.        Recent Disability Finding for Hodge

Immediately after the ALJ's decision on December 1, 2006, Hodge stated that he submitted a subsequent application for disability to the Agency, which found him to be disabled as of January 1, 2007. See Pl.'s Mem., p. 18. Hodge attached to his brief the Agency's determination. Id., Attachment 1. This determination was not dated, however, it indicated that the following evidence had been received in February and April of 2007 and used to decide Hodge's claim: reports from Minneapolis Cardiology; Immanuel St. Joseph's Hospital; Minnesota Ear Head & Neck Clinic; Abbott NW Hospital; and Lakeview Clinic; Kenneth L. Martens MS LP Psychology (consultative exam). Id. at p. 18, Attachment 1. The determination gave no indication as to what Hodge had alleged as the basis for his disability but did suggest that he was seeking a determination that he had been disabled since July 1, 2002 (the same date of onset alleged in the first application), because of congestive heart failure, memory problems, left leg and shoulder prosthesis, gout, and depression. In this regard, the Explanation of Determination stated the following:

> You said you have been disabled since July 1, 2002 because of congestive heart failure, memory problems, left leg and shoulder prosthesis and gout. Medical reports also show you have depression.
>
> However, prior to 01/01/07 the evidence shows:
>
>> -You had the ability to stand and walk without assistance.
>> -You had the ability to use your hands and arms to perform tasks although frequent overhead reaching on the left should be avoided.
>> - The pain caused by your condition was not severe enough to keep you from doing basic daily activities.
>> - Your heart was functioning adequately.
>> - In combination, your impairments were not severe enough to be disabling.

Based on your description of the job you performed as shipping, lead man for approximately 6 years, 1 month, we have determined that you had the ability to perform this type of work as it is ordinarily performed in the national economy.

Therefore, disability is established as of 01/01/07.

Pl.'s Mem., Attachment 1.

Based on the Agency's subsequent determination that he was disabled, Hodge argued that this Court should determine if new and material evidence exists that relates to the time period on or before the date of the ALJ's decision of December 1, 2006. Id. at p. 18.

42 U.S.C. § 405(g) provides in relevant part:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding, . . . .

See Sullins v. Shalala, 25 F.3d 601, 605 n. 6 (8th Cir. 1994) ("Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), grants reviewing courts the authority to order the Secretary to consider additional evidence, but 'only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'"). "To be 'new', evidence must be more than merely cumulative of other evidence in the record.  To be 'material', the evidence must be relevant to claimant's condition for the time period for which benefits were denied." Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000) (citations omitted). "Thus, to qualify as 'material,' the additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition." Id. at 1069-70 (citation omitted).[12]

---

[12]      Bergmann arose in the context of a submission of evidence to the Appeals Council as part of the claimant's request for review of the ALJ's unfavorable decision. There, the Eighth Circuit relied on regulations that provided that the Appeals Council must consider evidence submitted with a request for review if it is "(a) new, (b) material, and (c) relates to the period on or before the date of

Courts that have examined the effect a subsequent favorable ruling by the Commissioner on a claimant's later application for disability or social security benefits, have applied two different tests:

The first test provides:

> A remand on the basis of new evidence is warranted if: (1) the evidence is relevant to the determination of disability at the time the application(s) was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before her; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has made at least a general showing of the nature of the new evidence to the reviewing court. See Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985), superceded by statute, 42 U.S.C. § 405(g).

Graham v. McMahon, Civil Action No. 7:06cv00475, 2007 WL 2021893 at *2 (W.D. Va. July 06, 2007); see also Casar v. Astrue, 2008 WL 2276958 at *3, 5 (W.D. Va. June 03, 2008) (applying both tests).

The second test is stated as follows:

> "Where a second social security application finds a disability commencing at or near the time a decision on a previous application found no such disability, the subsequent finding of a disability may constitute new and material evidence." Hayes v. Astrue, 488 F.Supp.2d 560, 2007 WL 1666737, at *4 (W.D.Va.2007). Such evidence is not presumptive of disability as the application may involve the subsequent onset of further physical or psychological problems and/or a different age classification. Reichard v. Barnhart, 285 F.Supp.2d 728, 736 n. 9 (S.D.W.V.2003). However, when "disability is found upon subsequent applications on substantially the same evidentiary background as was considered with respect to prior applications without such occurrences, . . . the disability onset date might reasonably be sometime prior to the ALJ's decision respecting the prior applications in view of a subsequent finding of

the ALJ's decision." See Bergmann, 207 F.3d at 1069 (citations omitted).  While the evidence here was not submitted to the Appeals Council, this Court presumes that the same test would apply to evidence submitted to this Court as part of plaintiff's action before this Court. See Luna v. Astrue, No. CIV 07-719-PHX-MHB, 2008 WL 2559400 at *2 (D. Ariz. June 23, 2008) ("Pursuant to 42 U.S.C. § 405(g), 'remand is warranted only if there is new evidence that is material and good cause for the late submission of the evidence.' Bruton v. Massanari, 268 F.3d 824, 827 (9th Cir. 2001). New evidence is material if it 'bear[s] directly and substantially on the matter in dispute,' and if there is a 'reasonabl[e] possibility that the new evidence would have changed the outcome of the . . . determination.' See id. (quoting Booz v. Sec'y of Health & Human Servs., 734 F.2d 1378, 1380 (9th Cir. 1984).").

disability." Id.

Id.;[13] see also Luna v. Astrue, No. CIV 07-719-PHX-MHB, 2008 WL 2559400 at *2 (D. Ariz. June 23, 2008) ("Where a second social security application finds a disability commencing at or near the time a decision on a previous application found no such disability, the subsequent finding may constitute new and material evidence."); Reichard v. Barnhart, 285 F. Supp.2d 728, 734 (S.D. W.Va. 2003) (holding that an ALJ's decision finding disability commencing less than a week after claimant was found not disabled is new and material evidence). Such evidence is not necessarily preclusive of disability as the application may involve different medical evidence, different time periods, and a different age classification. See Bruton, 268 F.3d at 827. When a disability, however, "is found upon subsequent applications on substantially the same evidentiary background as was considered with respect to prior applications without such occurrences, . . . the disability onset date might reasonably be sometime prior to the ALJ's decision [with respect to] the prior applications in view of a subsequent finding of disability." Reichard, 285 F. Supp.2d at 736 n. 9.

Here, Hodge cannot meet the requirements of the first test. The Court has no evidence before it to determine the nature of the new evidence that was submitted to the Commission in connection

---

[13]    The Court notes that this test is consistent with the SSA's internal procedural guidelines set forth in its Program Operations Manual System ("POMS") which specify the procedure for addressing a subsequent application for disability that is filed and approved while a request for review on the initial application and unfavorable decision is pending before the Appeals Council. See SSA POMS SI 04040.025. While the POMS require that the favorable determination with respect to the subsequent application must be limited to the period beginning with the day after the date of the ALJ decision pending before the Appeals Council, it also directs the Appeals Council to "consider the evidence on the subsequent application to determine whether there is new and material evidence relating to the prior claim," and gives the Appeals Council the option to conclude that the favorable determination on the subsequent application is incorrect and reopen the subsequent allowance; or "vacate the ALJ decision on the prior claim, consolidate the prior and subsequent claims, and remand both to the ALJ for further proceedings, including a new decision." See Reichard, 285 F. Supp.2d at 731 n. 3 (citing SSA POMS SI 04040.025); see also, SSA I-5-3-17. Intructionsfor Processing Subsequent Disability Claim While a Prior Claim is Pending Review at the Appeals Council issued April 30, 2001 (same).

with Hodge's subsequent application for benefits. Lacking such information, the Court is unable to evaluate: (1) its relevancy to the determination of disability at the time his first application was first filed; (2) whether the evidence is material—i.e. whether the Commissioner's decision might reasonably have been different had the new evidence been before him; and (3) whether he has made at least a general showing of the nature of the new evidence to the reviewing court.[14]  While there is clearly overlap with respect to the identity of some of the medical providers that provided records in connection with both applications (e.g. Minneapolis Cardiology; Immanuel St. Joseph's Hospital; Minnesota Ear Head & Neck Clinic; Abbott NW Hospital; and Lakeview Clinic), the Court has no way of knowing if new records were obtained from these providers or whether what was obtained and considered in connection with the second application were at least some of the same reports that the ALJ had before him on the initial application. In fact, based on the reasoning articulated by the Commissioner for denying his claim for disability prior to January 1, 2007 (i.e. that prior to this date, Hodge had the ability to stand and walk without assistance, to use his hands and arms to perform tasks although frequent overhead reaching on the left should be avoided, the pain caused by his condition was not severe enough to keep him from doing basic daily activities, his heart was functioning adequately; and in combination, his impairments were not severe enough to be disabling), it appears that the new evidence that caused the Commissioner to determine that Hodge was disabled as of January 1, 2007, was the consultative examination by psychologist Martens – information that clearly was not provided to the ALJ in connection with Hodge's first application.[15]

---

[14]     Assuming that the favorable decision on the second application was rendered after the Appeals Council had issued its denial of review on August 30, 2007, there is good cause for Hodge's failure to submit this favorable determination to the Council.

[15]     As noted previously, the ALJ had rejected the significant difficulties Hodge's claimed he was having with memory and mood, based on the fact that Hodge has not sought or received any mental health treatment, did not use psychotropic medication and had not needed psychiatric hospitalization or crises center interventions. (Tr. 24).

However, based on the second test, where the second social security application found a disability commencing so close on the heels (one month) of the ALJ's previous decision denying disability, this Court finds that the subsequent finding of a disability may constitute new and material evidence. As the various courts that have applied this test have found, while "[s]uch evidence is not presumptive of disability 'as the application may involve the subsequent onset of further physical or psychological problems and/or a different age classification,' when 'disability is found upon subsequent applications on substantially the same evidentiary background as was considered with respect to prior applications without such occurrences, . . . the disability onset date might reasonably be sometime prior to the ALJ's decision respecting the prior applications in view of a subsequent finding of disability.'" Graham, 2007 WL 2021893 at *2 (citations omitted); see also Luna, 2008 WL 2559400 at *2; Casar, 2008 WL 2276958 at *5; Hayes v. Astrue, 488 F. Supp.2d 560, 565 (W.D. Va. 2007) (citation omitted).

"Accordingly, in light of the possible inconsistency between the first decision and the subsequent finding of disability related to the second application, this case will be remanded to the Agency for further consideration and proper resolution of factual issues." Luna, 2008 WL 2559400 at *3 (citing Bradley v. Barnhart, 463 F. Supp.2d 577, 580-81 (S.D. W.Va. 2006) (stating that the "Reichard [case] stands for the proposition that an award based on an onset date coming in immediate proximity to an earlier denial of benefits is worthy of further administrative scrutiny to determine whether the favorable event should alter the initial, negative outcome on the claim.").

In summary, this Court finds that the ALJ gave proper weight to opinions of Dr. Keeley, properly evaluated Hodge's subjective complaints of disabling pain, and that neither Social Security Regulation 201.14 nor the ALJ's failure to prepare a Psychiatric Review Technique Form required a reversal of the ALJ's decision. Nevertheless, the Court does find that the subsequent determination

of disability by the Commissioner may constitute new and material evidence from which the Commissioner could conclude that the disability onset date might reasonably be sometime prior to December 1, 2006, the date of the ALJ's decision.  For these reasons, the Court recommends remand to the Commissioner for further consideration consistent with this opinion.

## VI.    RECOMMENDATION

THEREFORE, IT IS RECOMMENDED THAT:

1.     Plaintiff's Motion for Summary Judgment [Docket No. 10] be **GRANTED** and

2.     Defendant's Motion for Summary Judgment [Docket No. 14] be **DENIED**.

3.     The final decision of the Commissioner be **VACATED,** and this matter be **REMANDED** to the Commissioner pursuant to 42 U.S.C. § 405(g) for further administrative proceedings and proper resolution of factual issues to determine whether plaintiff was disabled before January 1, 2007.


Dated: August 14, 2008                              *s/ Janie S. Mayeron*
                                                    JANIE S. MAYERON
                                                    United States Magistrate Judge



Pursuant to the Local Rule 72.1(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before September 2, 2008, a copy of this report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.